UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLEN NAGHTIN,

              Plaintiff,

v

MONTAGUE FIRE DISTRICT BOARD
and DENNIS ROESLER, in his personal and
official capacity

              Defendants.

Case No. 1:14-cv-01224

Hon. Gordon J. Quist

_____

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

This is a claim under 42 U.S.C. § 1983 for violation of Plaintiff's First Amendment rights to free speech and to petition for redress. In December, 2011, the Defendants terminated Plaintiff from his long-term position as a Montague firefighter after he circulated among the firefighters and then submitted to members of the Fire Board and Chief Roesler a petition signed by 13 firefighters.  The petition requested that the Fire Chief's (Defendant Dennis Roesler's brother, Donald) brother be reinstated as their Captain.  The petition is attached as Exhibit 1.

Plaintiff now seeks summary judgment.  He believes there are no questions of fact (except as to damages) and that he is entitled to judgment as a matter of law as to his *prima facie* case.

## II.     STANDARDS FOR SUMMARY JUDGMENT

Plaintiff brings this motion under Fed. R. Civ. P. 56(c) for summary judgment.  Under Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)*; *Chapman v. A1 Transport, 229 F.3d 1012, 1023 (11th Cir.2000)*.   The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, *477 U.S. at 323*. Once the moving party has met its burden, Rule 56 requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*

Plaintiff does not believe there are any questions of fact.  None of the members of the Montague Fire Board who were deposed recalled much of anything that led to Plaintiff's termination as a 30+-year firefighter.[1]  And much of the Plaintiff's case can be proven from the Defendants' own documents.  All the jury needs to address is damages.

## III.    FACTUAL BACKGROUND

Plaintiff is a resident of the City of Montague.  He joined the Montague Fire Department in May, 1980 and served continuously until he was terminated by the Defendants on December 7, 2011.  At the time he was terminated, Defendant Dennis Roesler was the Fire Chief.  He and his brother, Donald, were also firefighters for a long time.  Their father was once the chief.  However, more recently, Dennis Roesler was terminated as chief due to a felony assault

---

[1]In fact, Robert P. Suits, Chair of the Personnel Committee of the Fire Board, testified that only two fighter fighters have ever been terminated in the history of the department - - Plaintiff and Donald Roesler.  He did not recall what he did with the petition after receiving it in the mail.  He did not recall which board meeting addressed the petition.  He did not recall whether the press was at the board meeting.  He did not recall any discussions about the petition.  He recalled sending the petition to the board's attorney, but did not know when it was sent.  He did not know when he spoke with Korthase after she received the attorney's opinion.  He did not recall what happened after they received the attorney's opinion.  The petition was brought up at the personnel committee meeting in November but he did not recall how it came up. (Suits dep p. 67-71).

Suits also did not recall which firefighter told the board that Plaintiff was the last person to have the petition.  He did not recall if any firefighters were at the meeting.  He did not recall if he did any investigation prior to the meeting into who wrote the petition.  As of the present he did not know who wrote the petition.  He did not know what the false statements and complaints in July 2009 were.  But, he was sure that they had nothing to do with Plaintiff asking to hold a wedding reception at the fire hall.  He did not recall the other violations alleged in Plaintiff's personnel file.  (Suits dep p.75-78)

Tracy Korthase, Chairperson of the Fire Board recalled there was a personnel committee meeting on 11/29/11 to discuss the firefighters' letter.  She did not recall what was discussed, only that the attorney ruled that it was a letter of complaint.  She really had no memory whatsoever about what occurred at the meeting. (Korthase dep. p. 26;40:41). She also recalled that the 11/29/11 meeting agenda listed "fact-finding" as item B.  But, she had no idea what type of fact-finding occurred once the letter was determined to be a complaint. (Korthase dep. p. 29)

conviction for which he served jail time.  Regardless, the Board has kept him on the force as a firefighter.

At various times during his tenure with the Fire Department, Plaintiff engaged in activities protected by the First Amendment, including speaking out on issues of public concern and petitioning the Defendants regarding Defendant Roesler's retaliation against firefighters who also engaged in such activity.  He claims in this case that he was terminated for protected activities.  The origin of the dispute between Plaintiff, Defendant Roesler and the Fire Board began with the Board's authorizing construction of a new fire station.  At the time, Dennis Roesler was Fire Chief, and his brother, Donald, was the second-highest ranking officer - - Captain.  He was elected to that position by the firefighters themselves[2].  During various stages of construction Donald pointed out flaws in the construction, including, ironically, fire code violations and deviations from accepted specifications. However, Dennis, the Chief, was appointed by the Board to supervise the construction so all communications about it were required to go through him and the other appointed supervisor.  This enabled the Chief to keep non-compliance issues from the public view as he could handle all those issues on his own.  They never had to be discussed at public meetings.

Donald became increasingly frustrated with his brother's refusal to follow code and specifications for the fire station.[3]  He eventually requested a leave of absence.  Not only was this

---

[2]One of the issues the petition meant to address was the firefighters' concerns that Dennis Roesler did whatever he wanted and himself ignored various policies and procedures governing their employment.  They wanted the Board and the citizenry to understand his seemingly unbridled power.

[3]According to Plaintiff, Donald put some of his complaints about the building code violations in writing to the Fire Board. (T17).

4

request denied, Dennis immediately demoted him from Captain. (Naghtin dep p. 27, 29) After Donald had been gone about six months, he asked to extend his leave because his issues with the new fire station had still not been addressed.  At a time when Donald's extended leave was expiring, it became clear that he would either have to return as a firefighter or permanently resign.  It was at this point that some of the firefighters decided to take action to address the situation.  (Naghtin dep p 32)[4].  Plaintiff does not believe that either Dennis or the Board acted properly in demoting Donald, once he was elected by the membership[5].

After  Donald was demoted, Plaintiff circulated the petition (Exhibit 1)  dated October 18, 2011 among most of the firefighters[6].  One of the points of the petition was that Donald had both military leadership and specialized training that other firefighters in Montague did not have. They depended on him for these skills. Donald was also the only firefighter who had been certified as a State Fire Marshal for purposes of investigating arson fires.  After his leave, the department was forced to hire outside fire marshals at an increased expense to the Fire Board. (Naghtin dep p 57).  The purpose of the petition was to inform the citizens of the fire district that their Fire Chief was leaving them without properly trained personnel in certain aspects of fire protection because Donald Roesler had been speaking out on issues of public concern, including problems connected with the building of the new fire station.

---

[4]Plaintiff also testified that he had personally addressed Donald's absence with Chief Roesler directly more than once over the year he was gone.  (Naghtin dep p 39-40).

[5]See previous footnote.

[6]He did not circulate it to any member of the Roesler family.

Plaintiff testified that a woman from his place of business mailed the petition to each of the Board members and to Dennis Roesler. (Naghtin dep p 46). There was nothing else in the envelope and the intent was that the petition came from the 13 firefighters who signed it. (Naghtin dep p 46-47). A copy of the petition may also have been given to the media which attended a later Board meeting.

According to Plaintiff's testimony, he considered Exhibit 1 a petition. "It was a simple request that the board take action per the public's best interest." (Naghtin dep p. 54). Plaintiff was baffled as to why the Board would spend the money it did to train Donald and then deprive the firefighters and the public of that training.

The Fire Board held a Personnel Committee meeting on November 29, 2011 to discuss Exhibit 1 and what to do about it. (Exhibit 2: Minutes of Meeting). The Committee reviewed the petition. The minutes specifically note that the Board's attorney gave a "legal ruling" that the "Committee is to treat this letter as a written Complaint"[7]. (Exhibit 2 ¶ 2). It was then "noted" that Plaintiff was the last person to possess the letter after everyone signed it. The minutes then opined that Plaintiff should have turned the letter over to the Fire Chief "per the PPP (Personnel Policies and Procedures)'. Accordingly, he was found to be "in direct violation" of the PPP. Accordingly, members of the Personnel Committee asked the Fire Chief to recommend discipline for Plaintiff in light of his "disregard of following proper procedures on many occasion (sic) as set forth in the PPP". (Exhibit 2 ¶8).

---

[7]The significance of this "ruling" according to the Defendants was to require, per the PPPs that the petition first be submitted to the Chief under the odd "chain-of-command" procedure in the PPPs that begins with the Chief and then steps down to the officers and then back up again to the Board. (Exhibit 3 p. 6)

On December 3, 2011, Tracy Korthase, Chairperson of the Fire Board, sent Plaintiff a letter telling him there would be a Special Board Meeting on December 7, 2011 to consider what disciplinary action, if any, should be imposed for "his actions as a member of the Montague Fire Department". (Exhibit 4)[8]  He was further told that the Board will discuss his actions "which may not have followed proper procedure" per the PPPs and the Bylaws.

> This subject includes, but is not limited to, the fire fighter letter that was carried around for signatures and mailed to the Board in October, 2011.  After review of fire fighters letter, the Board sought legal counsel, and the letter was determined to be a letter of complaint.  Because it was a complaint, this should have gone direct to the Chief, per procedures for complaints, and not to the Board.
> (Exhibit 4 ¶ 3)

At the December 7th Special Meeting, Plaintiff spoke at the meeting:

> I don't see anywhere in the Personnel Policies and Procedures that brings me in front of a Board meeting because I may have done something wrong.  It says that the Chief will call me in and talk to me, which has never happened.  The one write up that I do have was the only comment of anything bad that I ever had a conversation with Dennis about.  If those are the rules then they should have been followed.
>
> As for the petition, I did not see it as a complaint as you called it.  At the time it was a request for action.  Why is it a complaint?  The Board paid money to an attorney to get it ruled that it was a complaint.  It was a formal written request made to the Board, a petition signed by the firefighters.  Our acting captain Jack Schultz signed it.  As command officers he and the other command officers that signed it should have warned me and said you could get in trouble for this.  It would stand to reason that they should understand the rules and instead they signed the petition.
> (Exhibit 6 p. 2 at top)

---

[8]Plaintiff requested this meeting be scheduled on a different day since his stepdaughter had a band concert that night.  Ms. Korthase denied his request. (Exhibit 5)

Without much ado, Defendant Dennis Roesler recommended that the Board terminate Plaintiff's employment.   The Board agreed.   Plaintiff was terminated.   (Exhibit 6 p 2 (at bottom) to (top of) p.3).   No one mentioned any reason for termination other than Plaintiff's not giving the "complaint" (as they called it) to the Fire Chief.

Plaintiff brought this case to redress his termination because he believes he was speaking out as a citizen about matters of public concern.   Termination is certainly such action designed to chill any firefighter of ordinary sensitivities from exercising his or her rights to First Amendment protections

## IV.   ARGUMENT

### A.   The First Amendment General Analysis

The Sixth Circuit has recently outlined the analysis required in a First Amendment retaliation case, in *Stinebaugh v. City of Wapakoneta, _____ Fed. Apx _____; 2015 WL 7003757, at *3 (6th Cir. Nov. 10, 2015)* (copy attached):

> We employ a burden-shifting framework to determine whether an employee has established a claim of First Amendment retaliation. *Benison v. Ross, 765 F.3d 649, 658 (6th Cir.2014)*. To establish a *prima facie* case, the employee must demonstrate that: (1) he was engaged in constitutionally protected speech or conduct; (2) he was subjected to an adverse employment action that would deter a person of ordinary firmness from continuing to engage in that speech or conduct; and (3) the protected speech was a substantial or motivating factor for the adverse employment action. *Id.*

Accord: *Boulton v Swanson, 795 F.3d 526, 530 (6th Cir. 2015).*

8

**1.      Plaintiff Was Engaged in Constitutionally-Protected Speech**

The United States Supreme Court's latest decision on the application of the First

Amendment to public employees was in *Lane v. Franks, _____ U.S. _____; 134 S. Ct. 2369,*

*2374 (2014)*. It summarized its previous holdings:

> Almost 50 years ago, this Court declared that citizens do not
> surrender their First Amendment rights by accepting public
> employment. Rather, the First Amendment protection of a public
> employee's speech depends on a careful balance "between the
> interests of the [employee], as a citizen, in commenting upon
> matters of public concern and the interest of the State, as an
> employer, in promoting the efficiency of the public services it
> performs through its employees."[9]  *Pickering v. Board of Ed. of
> Township High School Dist. 205, Will Cty., 391 U.S. 563, 568, 88
> S.Ct. 1731, 20 L.Ed.2d.811 (1968)*  In *Pickering*, the Court struck
> the balance in favor of the public employee, extending First
> Amendment protection to a teacher who was fired after writing a
> letter to the editor of a local newspaper criticizing the school board
> that employed him. Today, we consider whether the First
> Amendment similarly protects a public employee who provided
> truthful sworn testimony, compelled by subpoena, outside the
> course of  *2375 his ordinary job responsibilities. We hold that it
> does.

Since its earlier decision in *Borough of Duryea, Pa v Guarnieri, 131 S Ct 2488 (2011)*, litigation

has continued to define when a public employee speaks as a citizen and when his or her speech is

a matter of public concern.

**a.      The First Issue is One of Law for the Court**

The Sixth Circuit has held that this is an issue of law for the trial court*.  Brandenburg v.*

*Housing Authority of Irvine, 253 F. 3d 891, 897 (2001)*.  The court will look at both the content

---

[9]While not directly at issue here, it is interesting to note that Korthase, the chairperson of the Fire
Board admitted that the Fire Chief said at the 11/9/11 meeting that the letter did not bother him at all and
hadn't caused any problems in the department.  (Korthase dep p 47).

and context of Plaintiff's speech to determine whether his statements were made pursuant merely to her professional duties. *Fox v. Traverse City Area Pub. Sch. Bd. of Educ., 605 F.3d 345, 348 (6th Cir.) cert. denied, 562 U.S. 1062, 131 S.Ct. 643, 178 L.Ed.2d 478 (2010).*

The First Amendment protects "the public's interest in receiving informed opinion as [much as] the employee's own right to disseminate it." *Lane,* 134 S.Ct. at 2377 (quoting *San Diego v. Roe,* 543 U.S. 77, 82, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam)). Consequently, we consider "the distinction between matters of public concern and those only of private interest, 'not [between] civic-minded motives and self-serving motives.' " *Mosholder v. Barnhardt, 679 F.3d 443, 450 (6th Cir.2012).*

The recent *Stinebaugh* case prompts Plaintiff's Motion for Summary Judgment. Stinebaugh was a firefighter who spoke to city council members, expressing his opinion that "purchasing a rescue engine was not a good use of taxpayer money." *Id at *5.* The Sixth Circuit analyzed its previously-identified relevant factors in determining if an employee is speaking as a citizen/taxpayer or an employee. These include "the impetus for the speech, the setting of the speech, the speech's audience, and its general subject matter." *Handy–Clay v. City of Memphis, Tenn., 695 F.3d 531, 540 (6th Cir.2012)* (quoting *Weisbarth v. Geauga Park Dist., 499 F.3d 538, 546 (6th Cir.2007).* Also relevant is whether the statements were made to individuals "up the chain of command," *Fox, 605 F.3d at 350* (quoting *Davis v. McKinney, 518 F.3d 304, 313 (5th Cir.2008)*), and whether the content of the speech is just a quintessential employee beef: management has acted incompetently.' " *Haynes v. City of Circleville, 474 F.3d 357, 365 (6th Cir.2007)* (quoting *Barnes v. McDowell, 848 F.2d 725, 735 (6th Cir.1988)).* Factors that may be relevant but are not dispositive also include whether the speech was made inside or outside of the

10

workplace and whether it concerned the subject-matter of the speaker's employment.

*Handy–Clay, 695 F.3d at 541* (citing *Garcetti, 547 U.S. 420–21).*

The *Stinebaugh* Court "had no trouble concluding that" he was speaking as a citizen on a matter of public concern. *Id at *5.*

Plaintiff Glen Naghtin was speaking both as a citizen and as a firefighter (one of 13) who was concerned with the Fire Chief's unbridled power; his insisting on rules that suited him and ignoring those that did not. They were concerned that the brother-on-brother feud within the fire department was hurting both the firefighters and the taxpayers in terms of what they had paid for. They were concerned that the fire station may not meet code and that the public may not know that. There really can be no question that this was a matter of public concern, no matter in what capacity the firefighters were speaking. As Plaintiff also explained at his deposition:

> Q.    Sure. Did you believe that public safety was jeopardized by Don not being the captain?
>
> A.    Yes.
>
> Q.    In what way?
>
> A.    He did fire safety education also that to my knowledge is not being conducted to this day yet. That was a spin off from his training and certifications he had. He would go to like senior citizen's apartment buildings and put on a fire safety thing for them, do things at the school. I know the department goes to the school somewhat but it's a difference of do you have somebody that's been trained in how to teach people, or somebody saying, hey, you shouldn't play with matches, that's a bad thing. So I believe he brought better education to places that are not receiving any education at this time.
> (Naghtin dep p 71)

##### 2.        Plaintiff Suffered Adverse Employment Action

Termination is the capital punishment of "adverse employment action."  This issue
cannot be in serious dispute.

##### 3.        The Protected Speech Was a Substantial or Motivating Factor for the Adverse Employment Action

The Minutes of the December 7, 2011 Special Board Meeting show, without any
question, that Plaintiff will satisfy this element of his *prima facie* case.  At the beginning of the
discussion[10], one of the Board Members asks if Plaintiff received written notice of violations at
the time of prior incidences of his allegedly not following the PPPs.  Plaintiff responded that he
only knew about the July 24, 2009 incident being in his personnel file.  He said he had no notice
of any other times he allegedly violated PPPs.  In fact, he also testified that there was no
reprimand in his personnel file about his letter to the Board Chair in May, 2010 concerning the
Chief's new decision to depart from the firefighters' rules and appoint all officers.  (Naghtin dep
p 52).

He later wondered how exactly he ended up in front of the Board over a "complaint" they
claimed should have been first submitted to the Fire Chief.  Ms. Korthase then piped up that
soliciting the letter around the workplace without the consent of the Chief was another violation.
Plaintiff denied the petition was circulated around the fire station.  Once the case was started, he
testified that he went to the firefighters' homes to collect signatures (Naghtin dep p 37).  After all
the hearsay which clutters the record, Bob Suits, as Chair of the Personnel Committee asked the
Fire Chief to make a recommendation.  And, of course, Roesler recommended that Plaintiff be

---

[10]Which is, quite oddly, included in the Minutes.

12

immediately terminated from the fire department.  Ms. Korthase asked if there was a motion to

accept the Chief's recommendation.  She got one, a second and then a 5-2 vote to terminate

Plaintiff's 30+ year employment.

Had he not last possessed Exhibit 1, he would likely still be on the force today.

## V.   CONCLUSION

Plaintiff believes he will meet the burden of his *prima facie* case.  The Defendants have

no other explanation for why he was terminated.  The documents they authored clearly show

their rationale and the impetus for their decision.

For all of the reasons stated in this Brief, Plaintiff requests that he be granted summary

judgment on his prima facie case.


Dated: December 14, 2015                    /s/ Judy E. Bregman
                                            Judy E. Bregman (P32252)
                                            BREGMAN & WELCH
                                            Attorneys for Plaintiff
                                            212 Washington, P.O. Box 885
                                            Grand Haven, MI 49417
                                            (616) 846-3145